# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1646

_____

United States of America,　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　　　Appellee,　　　　　　　*
　　　　　　　　　　　　　　　　　　*　Appeal from the United States
　　　v.　　　　　　　　　　　　　*　District Court for the
　　　　　　　　　　　　　　　　　　*　District of Minnesota.
Timothy John Ehrmann,　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　　　Appellant.　　　　　　　*

_____

Submitted:  December 13, 2004
Filed:  August 31, 2005

_____

Before ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Timothy John Ehrmann (Ehrmann) appeals his convictions and sentence.  In April 2003, the government charged Ehrmann with eight counts of conspiracy to distribute, aiding and abetting possession with intent to distribute, and possession with intent to distribute methamphetamine and ecstasy between April 2001 and February 2003.  A jury found Ehrmann guilty of seven counts, and the district court[1] sentenced him to 360 months' imprisonment and five years' supervised release.  On

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

appeal, Ehrmann assigns numerous errors, including (1) the denial of his suppression motion; (2) the denial of a fair trial due to the prosecutor's peremptory strike of a prospective juror based on the juror's sexual orientation; (3) the admission at trial of prejudicial videotape evidence; (4) the denial of his right to testify on his own behalf; (5) prosecutorial misconduct; (6) the improper assessment of a two-level sentencing enhancement for obstruction of justice; and (7) Booker sentencing errors. Finding no reversible errors, we affirm.

## I.    BACKGROUND

### A.    Factual Summary

After earning a bachelor's degree in finance, Ehrmann worked as a controller for three different companies. He later completed a master's degree in business administration and earned an annual salary of nearly $70,000. In late September 2001, Ehrmann was laid off due to a corporate merger. He then decided to apply his considerable business acumen to organizing a nationwide narcotics operation based out of his Minneapolis home.

Law enforcement first learned of Ehrmann's involvement in narcotics trafficking in April 2001, when United States Customs officials interdicted a package of ecstasy mailed from Toronto, Ontario, to a Minneapolis residential address. Customs officials made a controlled delivery to the residence, and Ian St. James (St. James) signed for the controlled package. After arresting St. James, law enforcement searched the residence and found Northwest Airlines ticket stubs for a return trip from Minneapolis to Toronto in March 2001. The tickets were issued to St. James, but they were addressed to Ehrmann.

Upon being arrested, St. James agreed to cooperate with law enforcement. St. James phoned co-defendant Thomas Haslip (Haslip), who later arrived at St. James's residence. Haslip discussed with St. James the distribution of 1,500 ecstasy pills before taking possession of the controlled package and departing. Haslip delivered

the package to 4302 Portland Avenue, a residence owned by Ehrmann, where he and Haslip lived. Thereafter, law enforcement agents obtained a search warrant and searched Ehrmann's residence, where they found evidence of three recent wire transfers from Ehrmann to St. James in the amounts of $8,000, $4,500 and $1,700, and a fourth wire transfer from Ehrmann to Ron Geoff. Agents also discovered and seized a notebook recording drug orders. Law enforcement officers made no arrests, but they continued to monitor Ehrmann's residence in an attempt to discover more information about the ongoing narcotics operation.

In January 2002, Bloomington, Minnesota, police stopped Anthony Florian (Florian), who possessed ninety-three grams of methamphetamine. Florian agreed to cooperate with authorities, telling them he had located a supply source for methamphetamine in Arizona, and Ehrmann and others had given Florian $4,500 to purchase methamphetamine. Thereafter, Florian purchased eight ounces of methamphetamine, delivered four ounces to Ehrmann, and retained possession of four ounces, approximately the amount Florian possessed when the police stopped him. Police also seized from Florian detailed drug ledgers containing numerous references to "TE," which police presumed were the identifying initials of Timothy Ehrmann.

Six months later, on June 8, Trooper Anthony Gerard (Trooper Gerard), an Arizona Highway Patrol Officer, pulled over an automobile on Interstate 40 traveling ninety-four miles per hour. Eugene Blaylock (Blaylock) was driving, and Ehrmann was riding in the front passenger seat. Trooper Gerard approached the car and spoke first to Blaylock, who gave Trooper Gerard the rental agreement and his Texas driver's license. Ehrmann did not acknowledge Trooper Gerard, but instead focused intently on his laptop computer. Trooper Gerard asked Blaylock why he was traveling from Dallas to Arizona, and Blaylock told Trooper Gerard he and Ehrmann came to Arizona "just to hang out." Blaylock also told Trooper Gerard he was unemployed and had been for some time.

Trooper Gerard issued Blaylock a speeding ticket, and then told Blaylock he was free to go. As Blaylock began walking back to the car, Trooper Gerard asked Blaylock if he would answer a few more questions, and Blaylock said he would. After asking Blaylock several questions related to narcotics trafficking, Trooper Gerard asked Blaylock's permission to search the vehicle. Blaylock paused for a second before consenting to the search. When Blaylock attempted to remove the car keys from the ignition, Ehrmann inquired what Blaylock was doing and Ehrmann then objected to the search. After Blaylock and Ehrmann conversed for about ten seconds, Blaylock told Trooper Gerard that Ehrmann did not want the car searched, and Trooper Gerard would need to talk with Ehrmann.

Trooper Gerard then approached the passenger side of the vehicle and noticed Ehrmann had set down his laptop computer and was now fidgeting in his seat, squirming back and forth. Trooper Gerard asked Ehrmann for permission to search the vehicle. Ehrmann told Trooper Gerard he had been delayed long enough and did not want to wait for Trooper Gerard to search the vehicle. Ehrmann's hands were shaking, causing Trooper Gerard to believe Ehrmann was nervous. Trooper Gerard assured Ehrmann the search would take only five minutes, but Ehrmann renewed his objection to the search, this time saying he did not want his privacy invaded. When Trooper Gerard asked Ehrmann if there were any illegal drugs in the vehicle, Ehrmann's right eyebrow began twitching uncontrollably. At this point, Trooper Gerard called a canine unit to the scene.

Seventeen minutes later a canine unit arrived. When the handler walked the canine around the vehicle, the canine alerted to the trunk. The officers then opened and searched the trunk. The search revealed a small black bag inside a larger black duffle bag. The small black bag contained two packages each with two packets of a white crystal substance. The packages weighed just under one pound and field tested positive for methamphetamine. The small bag also contained ten ecstasy tablets. The large black duffle bag contained a digital scale and $520 in cash. Trooper Gerard also

confiscated $156 from Ehrmann's wallet, two Dell computers, drug ledgers, and an American Airlines ticket addressed to Ehrmann, but issued to Blaylock for round-trip air travel between Dallas/Fort Worth and Minneapolis on October 19, 2002.

Following the search, officers arrested Ehrmann on state drug charges. He posted bond and returned to Minneapolis, where he continued to purchase large, distributable quantities of methamphetamine and ecstasy. In August 2002, Ehrmann traveled with Haslip to Arizona, where they purchased methamphetamine, which they mailed to Minneapolis, before returning by air. In October, Ehrmann and Haslip traveled to Las Vegas, where they met a drug supplier named Timothy Range (Range) at a circuit party.[2] Initially, Haslip purchased one pound of methamphetamine from Range. Throughout November and December, Ehrmann lived with Range and purchased two to three pounds of methamphetamine from Range on five or six occasions.

On February 12, 2003, Ehrmann was arrested in San Diego attempting to purchase three pounds of pseudoephedrine[3] from an undercover Drug Enforcement Agency (DEA) agent. Ehrmann admitted to the DEA agent he intended to process the pseudoephedrine into methamphetamine. When Ehrmann was arrested, agents also seized $18,000 in cash and approximately 325 tablets of ecstacy, which Ehrmann offered to sell to the DEA agent.

## B.    Procedural Summary

A federal grand jury returned a seven-count indictment against Ehrmann and four co-defendants in March 2003. The indictment alleged a conspiracy to distribute ecstasy and methamphetamine, possession of controlled substances with intent to

---

[2]Circuit parties are a series of gay dance parties held around the world.

[3]Pseudoephedrine is a precursor chemical used in manufacturing methamphetamine.

distribute, and aiding and abetting possession with intent to distribute controlled substances. The following month, the government filed a superceding indictment adding Jimmie Charles Orr (Orr) as a defendant and an eighth count charging Ehrmann and Orr with possession of methamphetamine with intent to distribute. Ehrmann and four co-defendants pled not guilty and proceeded to trial. Orr pled guilty to the conspiracy count, and agreed to cooperate with authorities.

Before trial, Ehrmann moved to suppress the physical evidence seized from the rental car in Arizona. Adopting the report and recommendation of the magistrate judge, the district court denied the suppression motion. During the three week trial, the government called some thirty witnesses, including Trooper Gerard, Orr, Range, and several unindicted co-conspirators who either had sold distributable quantities of drugs to Ehrmann and Haslip or had purchased drugs for resale from them. The jury convicted Ehrmann of seven of the eight counts, including the conspiracy count.

On March 8, 2004, the district court sentenced Ehrmann to 360 months' imprisonment. In determining the sentence, the district court adopted the drug quantity finding proposed in the Presentence Investigation Report (PSR), and twice assessed two-level role enhancements, one for Ehrmann's role in the offense and a second for obstruction of justice. Ehrmann appeals his convictions and sentence, contending the district court erred in (1) denying his motion to suppress, (2) denying a Batson challenge, (3) admitting a videotape into evidence, (4) failing to have Ehrmann waive his right to testify on the record, (5) prejudicing his right to a fair trial based on cumulative prosecutorial misconduct, and (6) assessing a sentencing enhancement for obstruction of justice. After oral argument, Ehrmann's counsel filed a letter, pursuant to Federal Rule of Appellate Procedure 28(j), claiming Sixth Amendment Booker sentencing errors.

## II. DISCUSSION

### A. Pretrial Suppression Motion

When considering a district court's order denying the suppression of evidence, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Welerford, 356 F.3d 932, 935 (8th Cir. 2004). "We must affirm an order denying a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004) (internal quotation omitted).

Traffic stops constitute "seizures" within the meaning of the Fourth Amendment, United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004), and must be reasonable under the principles of Terry v. Ohio, 392 U.S. 1 (1968), Fuse, 391 F.3d at 927. Generally, a traffic "stop must be supported by at least a reasonable, articulable suspicion that criminal activity" has occurred or is occurring. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). A traffic violation, no matter how minor, creates probable cause for a law enforcement officer to stop the vehicle. See United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996). In performing a traffic stop, the officer may conduct investigatory procedures "reasonably related in scope to the circumstances that initially" justified the interference. United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000) (per curiam). The officer may detain a motorist while the officer performs routine tasks, such as writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history. United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999).

However, "once the officer decides to let a routine traffic offender depart with a ticket, a warning or an all clear–a point in time determined, like other Fourth Amendment inquiries, by objective indicia of the officer's intent–then the Fourth Amendment applies to limit any subsequent detention or search." Id. at 648. An

officer cannot continue to detain a motorist after the officer completes the initial stop, unless the officer has "a reasonably articulable suspicion for believing" criminal activity is afoot. United States v. Beck, 140 F.3d 1129, 1134 (8th Cir. 1998); see also Fuse, 391 F.3d at 927-28; Jones, 269 F.3d at 925 (explaining "with the purpose of the traffic stop completed, it would be an unreasonable extension of the scope of the investigation for [the trooper] to further detain [the suspect] or his vehicle, 'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention'") (quoting United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995)).

The facts surrounding the traffic stop in this case are straightforward. Trooper Gerard clocked the rental vehicle traveling nineteen miles per hour in excess of the speed limit. Trooper Gerard had probable cause to stop the vehicle for speeding. United States v. Winters, 221 F.3d 1039, 1041 (8th Cir. 2000). Once Trooper Gerard issued Blaylock a speeding citation and told him he was free to go, Ehrmann argues Trooper Gerard no longer had reasonable suspicion to delay the vehicle or its occupants.

Recently, we declared "the termination of a traffic stop does not effectively erase the objectively reasonable suspicions developed by a police officer during the traffic stop." Fuse, 391 F.3d at 929. Our review of Ehrmann's suppression record convinces us Trooper Gerard had developed objectively reasonable suspicions before first asking Blaylock, and then Ehrmann, for consent to search the vehicle. When Trooper Gerard first approached the vehicle, he testified he thought it strange Ehrmann did not look up from his computer and make eye contact with him. Trooper Gerard also found it odd that Blaylock said he was driving from Dallas to Phoenix with no specific purpose, other than to "just to hang out." He also thought it suspicious Blaylock would be vacationing when he was unemployed. Trooper Gerard's initial suspicions increased when Blaylock initially consented to a search, but then told Trooper Gerard he would have to speak to Ehrmann. When Trooper

-8-

Gerard approached Ehrmann to discuss the matter, Trooper Gerard testified Ehrmann appeared nervous, his hands were shaking, and he was fidgeting and squirming in his seat. Ehrmann first told Trooper Gerard he was in hurry and did not want to be detained further. When Trooper Gerard assured Ehrmann a search would take only five minutes, Ehrmann changed his basis for objecting to the search, telling Trooper Gerard a search would invade his privacy. Trooper Gerard then cut to the chase, asking Ehrmann whether illegal drugs were concealed in the vehicle. Upon hearing the question, Ehrmann's eyebrow began twitching uncontrollably, making Trooper Gerard even more suspicious that Ehrmann had something to hide. Under these facts, we conclude Trooper Gerard had reasonable suspicion to detain Ehrmann and call a canine unit. See Fuse, 391 F.3d at 929-30. The district court committed no error in denying Ehrmann's motion to suppress the fruits of the search.

### B. Batson Challenge

Ehrmann raised a challenge under Batson v. Kentucky, 476 U.S. 79 (1986), to the government's peremptory strike of a panel member, contending the government struck the panel member because of his sexual orientation. The district court denied the Batson challenge. The court first questioned Batson's application to sexual orientation challenges. Then the court found Ehrmann failed to make a prima facie showing of unlawful discrimination and the government offered legitimate, nondiscriminatory reasons for exercising a peremptory challenge against the panel member. Ehrmann attempts to elevate this challenge to the level of a constitutional error under the Batson line of cases, arguing the denial of his Batson objection denied him the right to a fair trial.

We review the district court's Batson ruling for clear error, United States v. Jones, 245 F.3d 990, 992 (8th Cir. 2001), and we accord great deference to the district court's findings, United States v. Roebke, 333 F.3d 911, 912 (8th Cir. 2003) (citing Batson, 476 U.S. at 98 n.21). Although the California Supreme Court has held sexual orientation should be a protected class for jury selection purposes, see People v.

Garcia, 92 Cal. Rptr. 2d 339, 347-48 (2000), and the Ninth Circuit has assumed, without deciding, sexual orientation qualifies as a Batson classification, Johnson v. Campbell, 92 F.3d 951, 953 (9th Cir. 1996), neither the United States Supreme Court nor this circuit has so held.

While we seriously doubt Batson and its progeny extend federal constitutional protection to a venire panel member's sexual orientation, our review of the trial record persuades us that even if Ehrmann made a prima facie case of purposeful discrimination, his Batson objection fails because the government offered legitimate, nondiscriminatory reasons for striking the panel member. The prosecutor told the district court he questioned the suitability of this panel member even before learning of the panel member's sexual orientation. The prosecutor was concerned about the panel member's liberal education and background, his livelihood as a musician, and his being a potential loner. Ehrmann offered no evidence to show the government's proffered reasons were pretextual. Accordingly, we find no clear error in the district court's denial of Ehrmann's Batson challenge.

### C.    Videotape Evidence

In his third assigned error, Ehrmann claims the district court erred in allowing the government to introduce prejudicial videotape evidence, the admission of which, Ehrmann claims, constituted prosecutorial misconduct. Ehrmann specifically objects to the admission of the videotaped phrase "Gay Mafia" as being inherently prejudicial. The government claims the videotape evidence of Ehrmann's admissions relating to his organization and pending conspiracy charges is plainly relevant. We review a district court's admission of evidence for abuse of discretion. United States v. Martin, 391 F.3d 949, 952 (8th Cir. 2005).

Our review of the videotape transcript establishes that, on January 3, 2003, Ehrmann visited a friend named Patrick Jarmuzek (Jarmuzek), while Jarmuzek was in custody at the Sherburne County Jail. The evidence further establishes Ehrmann

and Jarmuzek knowingly consented to communicating via video conferencing. Twice while conversing, they expressed their disdain of videoconferencing. The record does not reveal whether Ehrmann and Jarmuzek knew their conversation was being recorded, but given the jailhouse setting, they presumably considered the possibility.

During the jailhouse conversation, Ehrmann told Jarmuzek to let Ehrmann know if "they try and charge you with . . . conspiracy as of big picture conspiracy." Ehrmann then told Jarmuzek that Florian had been hauled back in court, and "they are threatening to charge him with conspiracy . . . , same as what Bam is being charged with." Ehrmann also told Jarmuzek, "they're trying to tie me very heavily to Bam," and "my attorney told me . . . the Feds . . . are looking to charge me federally now as well." Ehrmann predicted to Jarmuzek that if "they do that they're looking at . . . *Bam like this kingpin in the Gay Mafia* so to speak. . . . You or I would be the next best candidate after Bam." (emphasis added).

In discussing potential conspiracy charges, Ehrmann's phrase "kingpin in the Gay Mafia" appears not to be a reference to himself, but to "Bam," an unidentified co-conspirator. Ehrmann, not the government, uttered the "Gay Mafia" phrase in an apparent reference to an unidentified co-conspirator. Ehrmann's admissions regarding the activities of alleged co-conspirators were plainly relevant, as were his admissions concerning confiscated proceeds, his fears of future federal indictment, and his plan to lie low. We conclude the district court did not abuse its discretion in admitting the videotape evidence.

## D.    Right to Testify

Ehrmann also claims the district court erred in failing to obtain Ehrmann's express waiver of his right to testify on the record. After the government completed its case-in-chief and rested, the district court advised Ehrmann of his "personal" right to testify at trial. When the court inquired of Ehrmann if his lawyer had discussed with Ehrmann his right to testify, he responded in the affirmative. When the court

asked Ehrmann if he had any questions, Ehrmann responded in the negative. Ehrmann rested his case without testifying.

A district court is not required to obtain from a defendant an express, on-the-record waiver of his right to testify. If a defendant wishes to exercise his constitutional right to testify, a defendant "must act affirmatively and express to the court [his] desire to do so at the appropriate time or a knowing and voluntary waiver of the right is deemed to have occurred." United States v. Blum, 65 F.3d 1436, 1444 (8th Cir. 1995). Thus, we find no error.

### E.    Prosecutorial Misconduct

Ehrmann next claims the prosecutor impugned defense counsel's integrity by revisiting at trial a preliminary conflict-of-interest issue, which the magistrate judge had resolved in favor of Ehrmann. Before trial, Ehrmann knowingly waived any actual or perceived conflict of interest between his defense counsel and a government witness whom Ehrmann's counsel had represented two years earlier. "To obtain a reversal for prosecutorial misconduct, the defendant must show that (1) the prosecutor's remarks were improper, and (2) such remarks prejudiced the defendant's rights in obtaining a fair trial." United States v. King, 36 F.3d 728, 733 (8th Cir. 1994).

Ehrmann claims that during trial the prosecutor suggested to the district court Ehrmann's defense counsel was acting unethically, and during cross-examination would "use confidences" defense counsel received from his previous representation of a government witness named Jeremy Jacobsen (Jacobsen). As a result, Ehrmann claims the prosecutor denied him a right to a fair trial and to effective assistance of counsel. The government agrees that, before trial, the prosecutor raised the conflict-of-interest issue before the magistrate judge to protect Ehrmann's Sixth Amendment rights. However, the government argues defense counsel, not the prosecutor, was the first to revisit the conflict-of-interest issue at trial, when defense counsel informed the

court that, since the magistrate judge's ruling, a conflict of interest had arisen, and another attorney would cross-examine Jacobsen. Shortly before Jacobsen was called to testify, Ehrmann's counsel informed the court Ehrmann waived the newly discovered conflict of interest, and defense counsel would cross-examine Jacobsen. Only then, when asked by the district court to respond, did the prosecutor state the case law clearly established a presumption that confidences are passed between client and attorney during representation.

Having reviewed the record, we first note defense counsel never made a formal objection to the prosecutor's statements. The district court asked Ehrmann's counsel, "What kind of a ruling do you want or need?" Ehrmann's counsel responded, "I don't think we need one." Because the record contains no defense objection to the prosecutor's remarks or motion for mistrial based on prosecutorial misconduct, we review only for plain error. Johnson v. United States, 520 U.S. 461, 466-67 (1997) (standard of review); United States v. Boyd, 180 F.3d 967, 983 (8th Cir. 1999). After reviewing the relevant portions of the trial transcript, we find no prosecutorial misconduct and no showing of substantial prejudice to Ehrmann.

### F.    Sentencing Enhancement

In his last assigned error, Ehrmann contends the district court clearly erred in assessing a two-level enhancement for obstruction of justice under section 3C1.1 of the United States Sentencing Guidelines (Guidelines). The jury never heard evidence or made a determination regarding the issue of whether Ehrmann obstructed justice. Instead, the district court considered conflicting testimony and reports from law enforcement investigators and, based on a preponderance of the evidence adduced at sentencing, determined Ehrmann made death threats against a trial witness and the prosecutor. Under application note 4(a) to section 3C1.1 of the Guidelines, threatening a witness warrants the justice obstruction enhancement. U.S.S.G. § 3C1.1, cmt. n.4(a). Section 3C1.1 also applies when a defendant willfully attempts to obstruct or impede the administration of justice during the investigation,

-13-

prosecution, or sentencing of an offense. Finding Ehrmann obstructed justice, the district court applied a two-level enhancement under section 3C1.1(A) of the Guidelines, and sentenced Ehrmann to 360 months. Our record review persuades us the district court did not err in applying this enhancement.

### G.    Booker Errors

Following oral argument, Ehrmann submitted a Rule 28(j) letter citing Blakely v. Washington, 124 S. Ct. 2531 (2004), contending he is entitled to resentencing because he received an enhanced sentence based on the district court's drug quantity determination and its application of the obstruction of justice enhancement, without affording Ehrmann his Sixth Amendment right to a jury's determination of disputed facts, beyond a reasonable doubt. More recently, the Supreme Court held the mandatory application of the Guidelines is unconstitutional, but the Guidelines pass constitutional muster if applied in an advisory fashion. United States v. Booker, 125 S. Ct. 738, 756, 764-66 (2005). Although Ehrmann objected to the obstruction of justice enhancement and drug quantity at sentencing, his objections were not based on a Sixth Amendment challenge. Therefore, we review Ehrmann's Booker challenges only for plain error. United States v. Pirani, 406 F.3d 543, 550 (8th Cir. 2005) (en banc). "Plain error is error that is 'plain' (that is, clear or obvious), 'affects substantial rights' (that is, prejudicial) and 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" United States v. Rashid, 383 F.3d 769, 775 (8th Cir. 2004) (citing United States v. Olano, 507 U.S. 725, 732-37 (1993)).

The jury found Ehrmann conspired to distribute 500 grams or more of methamphetamine. The PSR found Ehrmann responsible for 386.56 grams of actual methamphetamine, 7,821.50 grams of methamphetamine mixture, 1,199.75 grams of ecstasy, and 1,360.80 grams of pseudoephedrine. Converting these drug amounts into their marijuana equivalent, the cumulative drug quantity totaled 37,582.08 kilograms of marijuana, resulting in a base offense level of 38. At sentencing, the district court adopted the PSR's drug quantity and also found Ehrmann had obstructed justice

based on evidence that Ehrmann made threats in jail against a trial witness and the prosecutor. The district court then sentenced Ehrmann to 360 months.

Applying the test for plain error, Ehrmann satisfies the first two factors. <u>Pirani</u>, 406 F.3d at 550. Having carefully reviewed the sentencing transcript, we glean nothing in the record to suggest the district court would have applied a more favorable sentence under an advisory sentencing regime. Thus, Ehrmann has not established the error affected his substantial rights, because he cannot demonstrate a reasonable probability that the district court would have imposed a more favorable sentence under an advisory sentencing guidelines regime mandated by <u>Booker</u>. <u>Id.</u> at 553. Morever, because the jury found beyond a reasonable doubt Ehrmann conspired to distribute 500 or more grams of methamphetamine, which is punishable by ten years to life, 21 U.S.C. § 841(b)(1)(A)(viii), his 360-month sentence does not exceed the statutory maximum life sentence. Consequently, we conclude there are no <u>Blakely</u>/<u>Booker</u> plain errors in this case.

## III.    CONCLUSION

We affirm Ehrmann's convictions and his sentence.

_____