# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1506

_____

United States of America,               *
\
                               *
\
         Appellee,              *
\
                               *   Appeal from the United States
\
      v.                      *   District Court for the
\
                               *   District of Nebraska.
\
Henry Avimael Salazar,          *
\
                               *
\
         Appellant.            *

_____

Submitted: June 13, 2006
\
Filed: July 20, 2006

_____

Before BYE, LAY, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Henry Avimael Salazar (Salazar) conditionally pled guilty to possession of methamphetamine with intent to distribute and criminal forfeiture, reserving the right to appeal the district court's[1] order denying his motion to suppress. On appeal, Salazar challenges the denial of his motion to suppress. Salazar also appeals his 108-

---

[1]The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska, adopting the report and recommendation of the Honorable David L. Piester, United States Magistrate Judge for the District of Nebraska.

month prison sentence, arguing the district court erred in denying his request for a mitigating role sentencing reduction. We affirm.

## I.       BACKGROUND

At approximately 9:15 a.m. on April 22, 2005, Nebraska State Patrol Trooper Jeff Roby (Trooper Roby) was conducting stationary radar surveillance on Interstate 80 in Hall County, Nebraska, when he observed Salazar's vehicle traveling east. Trooper Roby observed the vehicle quickly reduce its speed, and Trooper Roby then clocked Salazar's speed at seventy-seven miles per hour, two miles per hour over the posted speed limit. Trooper Roby followed Salazar's vehicle into a construction zone, where Trooper Roby determined Salazar was traveling at 63.5 miles per hour, 8.5 miles per hour over the posted speed limit. As Salazar's vehicle exited the construction zone, Trooper Roby stopped him for speeding.

Trooper Roby asked Salazar for his driver's license and vehicle registration. Salazar gave Trooper Roby his Utah driver's license, an insurance card, and a vehicle registration statement. Trooper Roby informed Salazar he had exceeded the posted speed limits and advised Salazar he would receive a warning citation. Trooper Roby asked Salazar if he owned the vehicle he was driving, and Salazar stated the vehicle belonged to his friend. Trooper Roby then asked Salazar the name of the friend. Trooper Roby testified Salazar "seemed to at first not know" the friend's name. After glancing at the name on the insurance card, Salazar provided the friend's name. When Trooper Roby asked Salazar where he was going, Salazar said he was going to Nebraska.

Trooper Roby requested Salazar accompany him to the patrol car while he prepared the warning citation. Once inside the patrol car, Trooper Roby asked Salazar when he left Utah. Salazar stated he departed Utah at 4:00 p.m. the previous day. Trooper Roby then asked Salazar about his destination, and Salazar advised he was traveling to Omaha, Nebraska, to meet family. Salazar explained he was on vacation

and planned to stay in Omaha for two, three, or four days. Salazar did not have a specific address for his family in Omaha, but he had a family member's cellular telephone number, and he believed he would exit Interstate 80 in Omaha at exit number 60 or 72.[2] Trooper Roby asked Salazar if he had slept, and Salazar advised he slept a couple hours at an interstate rest area. Trooper Roby also asked Salazar why he was driving his friend's vehicle and why the friend did not travel with Salazar. Salazar responded he borrowed the vehicle because his own vehicle was too small, would not make the trip, and had too many miles.

During this conversation, Trooper Roby initiated a computerized check of Salazar's criminal history. While Trooper Roby waited for the results of the check, Salazar told Trooper Roby he had received some traffic tickets and he had been arrested twice–once for an immigration violation, and once for a traffic violation. Salazar's criminal history report revealed offenses involving an immigration violation, interrupting an arrest, interfering with a police officer, and possessing cocaine and heroin.

After Trooper Roby gave Salazar the warning citation and handed Salazar his paperwork, Trooper Roby asked Salazar if he could ask a couple more questions. Salazar agreed. Trooper Roby asked Salazar if the vehicle contained any weapons or drugs, such as marijuana, cocaine, heroin, and methamphetamine, to which Salazar responded in the negative. Trooper Roby then asked Salazar if he could search the vehicle. Salazar answered, "uh-huh" and "yeah, go ahead." During the search, Trooper Roby found methamphetamine hidden in a false compartment built into the rear of the vehicle. Based on the discovery of the methamphetamine, Trooper Roby arrested Salazar.

---

[2]Although there are no exits off Interstate 80 in Omaha numbered 60 or 72, there are exits at 60th and 72nd Streets.

Salazar was indicted for possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1), and for criminal forfeiture, in violation of 21 U.S.C. § 853. Salazar moved to suppress the methamphetamine. The magistrate judge held an evidentiary hearing on the suppression motion. Ruling from the bench, the magistrate judge recommended the motion be denied, concluding (1) the traffic stop was lawful, (2) Trooper Roby had reasonable suspicion to expand the traffic stop, and (3) Salazar voluntarily consented to the search.

The district court conducted a de novo record review and adopted the magistrate judge's report and recommendation, denying Salazar's motion to suppress. At sentencing, the district court denied Salazar's request for a mitigating role sentencing reduction. The district court then sentenced Salazar to 108 months' imprisonment and 3 years' supervised release. This appeal followed.

## II.    DISCUSSION
### A.    Motion to Suppress

Salazar concedes the traffic stop was lawful. Salazar argues, however, that after Trooper Roby issued the warning citation, Trooper Roby lacked reasonable suspicion to justify subsequent detention. Salazar further argues he did not voluntarily consent to the vehicle search.

When considering a district court's order denying a motion to suppress, we review de novo the district court's legal conclusions, and we examine its factual findings for clear error. See United States v. Spencer, 439 F.3d 905, 913 (8th Cir. 2006). "We must affirm an order denying a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." Id. (quotation omitted).

When an officer effects a routine traffic stop,[3] the officer may conduct an investigation reasonably related in scope to the circumstances initially justifying the interference. United States v. Ehrmann, 421 F.3d 774, 780 (8th Cir. 2005). The officer also may detain a motorist while performing certain routine tasks, including writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history. Id. Once the traffic stop is completed, however, the officer cannot continue to detain a motorist "unless the officer has a reasonably articulable suspicion for believing criminal activity is afoot." Id. (internal quotation omitted).

During the traffic stop, Trooper Roby legitimately asked Salazar to accompany him back to the patrol car while he prepared the warning citation, checked Salazar's criminal history, and questioned Salazar about the purpose of his trip. Once Trooper Roby issued the warning ticket and returned Salazar's paperwork, Salazar had everything he needed to continue on his trip. Trooper Roby then asked Salazar if he could ask Salazar a couple more questions, and Salazar agreed. At that point, Salazar had been stopped for only a short time, and there is no indication the post-stop encounter was a seizure rather than consensual. Given Salazar's consent to further questioning, Trooper Roby lawfully asked Salazar whether he had any drugs in the vehicle. See United States v. Santos-Garcia, 313 F.3d 1073, 1078 (8th Cir. 2002) (holding that during post-stop consensual encounter, the officer may, without reasonable suspicion, ask further questions unrelated to the traffic stop).

---

[3]A traffic stop constitutes a "seizure" within the meaning of the Fourth Amendment, United States v. Ehrmann, 421 F.3d 774, 780 (8th Cir. 2005), cert. denied, 126 S. Ct. 1099 (2006), and must be reasonable under Terry v. Ohio, 392 U.S. 1 (1968). In general, "a traffic stop must be supported by at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring." Ehrmann, 421 F.3d at 780 (internal quotation omitted). Traffic violations, however minor, create probable cause to stop a vehicle. Id.

Salazar's consent to search given during the course of the consensual questioning was voluntary. Trooper Roby asked Salazar for permission to search his vehicle, and Salazar responded, ""uh-huh" and "yeah, go ahead." There is no indication Salazar was under the influence of drugs or alcohol at the time he consented, and Trooper Roby did not use any coercive tactics. English is apparently Salazar's second language. Trooper Roby spoke to Salazar in English, and Salazar appeared to have no trouble comprehending Trooper Roby's questions, although at times, Trooper Roby had difficulty understanding Salazar's pronunciation of certain words. Considering the totality of the circumstances, see Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973) (evaluating voluntariness of consent in light of the totality of the circumstances, including characteristics of the accused and the details of the interrogation), we conclude the district court did not clearly err in finding Salazar had a sufficient command of the English language to understand Trooper Roby's request for consent to search his vehicle, and Salazar voluntarily consented to the search.

Because Salazar consented to the additional questioning and to the search after Trooper Roby completed the traffic stop, we need not decide whether Salazar's answers to Trooper Roby's questions gave Trooper Roby reasonable suspicion to question Salazar about drugs or to search the vehicle. See Santos-Garcia, 313 F.3d at 1078 (holding that even if the officer lacked reasonable suspicion for believing criminal activity was afoot, the Fourth Amendment did not prohibit the officer from seeking consent to search the vehicle) (citation omitted). Accordingly, we affirm the district court's order denying Salazar's motion to suppress.

## B.    Mitigating Role

Salazar also challenges the district court's refusal to grant him a mitigating role sentencing reduction under U.S.S.G. § 3B1.2. We review the district court's decision to deny a mitigating role reduction for clear error. See United States v. Johnson, 408 F.3d 535, 538 (8th Cir. 2005).

Section 3B1.2 permits a two-level reduction if the defendant was a "minor participant." U.S.S.G. § 3B1.2(b). "A defendant bears the burden of demonstrating his entitlement to a minor participant reduction." United States v. Morales, 445 F.3d 1081, 1085 (8th Cir. 2006). "The propriety of a downward adjustment is determined by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable and by measuring each participant's individual acts and relative culpability against the elements of the offense." Id. (quotation omitted).

Contrary to Salazar's assertion, Salazar played a specific and substantial role in the crime. Salazar knew he was illegally transporting methamphetamine, making arrangements with a co-conspirator for delivery of the methamphetamine, which included driving the methamphetamine across the country, and maintaining contact with a co-conspirator during the trip. As the district court recognized, Salazar "was no stranger to drug activities," and "[h]e knew what he was doing." Accordingly, the district court did not clearly err in finding Salazar's role in the drug conspiracy was not minor compared to his co-conspirators.

## III. CONCLUSION

We affirm the judgment of the district court, and thereby affirm Salazar's conviction and sentence.

_____