# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2749

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Fidel Diaz Quintana, also known as | * | District of North Dakota. |
| Saul Rojo-Flores, also known as | * | |
| Miguel Martinez-Gonzales, also | * | |
| known as Miguel Joe Martinez, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: May 13, 2010
Filed: October 28, 2010

_____

Before RILEY, Chief Judge, LOKEN and MURPHY, Circuit Judges.

_____

LOKEN, Circuit Judge.

Fidel Diaz-Quintana conditionally pleaded guilty to re-entry by a deported alien following an aggravated felony conviction. See 8 U.S.C. § 1326(a) & (b)(2). Diaz-Quintana appeals the district court's denial of his motion to suppress, arguing that his lengthy detention following a traffic stop violated the Fourth Amendment because immigration officials may only "briefly detain [an alien] for questioning" when they have reasonable suspicion that he is illegally in the United States. 8 C.F.R. § 287.8(b)(2). The government responds that an immigration officer validly placed

Diaz-Quintana under administrative arrest, without a warrant, when brief questioning provided reason to believe that Diaz-Quintana was a deportable alien. Immigration officers then validly obtained probable cause to charge him with a criminal violation of the immigration laws during the ensuing administrative detention. Applying statutes and regulations authorizing questioning and detention of suspected illegal aliens, and reviewing Fourth Amendment suppression issues *de novo*, we agree with the government and therefore affirm. See United States v. Salazar, 454 F.3d 843, 846 (8th Cir. 2006) (standard of review).

## I.

At 2:30 p.m. on August 22, 2008, North Dakota Highway Patrol Trooper Christopher Messer stopped a car with Washington State license plates for speeding (88 m.p.h. in a 75 m.p.h. zone). The driver said his name was Fidel Diaz-Quintana, produced a Mexican driver's license bearing that name, and identified the passenger as his adult son. He had no immigration documents in his possession. He said that he and his son had attended a funeral in North Dakota and were returning to Washington in a car belonging to a relative.

Unable to verify the Mexican driver's license, Messer contacted the United States Border Patrol, a unit of the Department of Homeland Security. See 8 C.F.R. § 100.2(d)(2)(B)(iii). Suspecting drug trafficking, Messer also summoned Trooper Shawn Skogen and his drug dog, who arrived at 2:53 p.m. At 3:00, Border Patrol Agent Mark Bane returned Messer's call and spoke with Diaz-Quintana, who told Bane he entered the country under a valid Mexican passport but left both the passport and his visa in Washington. Meanwhile, Trooper Skogen's dog sniffed the vehicle's exterior and did not alert. Trooper Messer issued Diaz-Quintana a speeding ticket.

At Agent Bane's request, the Grand Forks Border Patrol Dispatch did a record check using the name and date of birth Diaz-Quintana provided but found no port-of-

entry crossing, visa information, or immigration history. Bane called Messer at 3:10 and spoke again with Diaz-Quintana, who confirmed he provided the name used on the visa application. Agent Bane requested a second preliminary record search, using several variations of the name Diaz-Quintana, which again returned no immigration information. Bane called Messer at 3:20 and told him to take Diaz-Quintana into custody for the Border Patrol. Messer took Diaz-Quintana to the Stark County Law Enforcement Center in Dickinson, North Dakota.

The next day, Border Patrol Agent Ben Lotvedt drove two hundred miles from the Border Patrol station at Portal, North Dakota and took custody of Diaz-Quintana in Dickinson. After arriving at noon, Agent Lotvedt drove Diaz-Quintana to the station at Portal. He was fingerprinted, provided personal biographical information, and was afforded but declined to exercise his right to speak with a Mexican consular official. Diaz-Quintana's fingerprints and biographical information were entered into the Border Patrol's IAFIS/IDENT computerized system. This search revealed that Diaz-Quintana's prints matched those of an alien named Saul Rojo-Flores, who had two prior drug convictions, had been deported twice, and had no permission to re-enter the country. Lotvedt advised Diaz-Quintana of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Diaz-Quintana waived those rights, admitted being previously removed and not applying for permission to re-enter, and claimed that he entered the United States at San Ysidro, California under a valid Mexican passport.

After Diaz-Quintana was indicted for violating 8 U.S.C. § 1326, he moved to suppress his incriminating statements to the Border Patrol agents while he was detained, as well as identity evidence derived from that detention. His Memorandum in Support set forth background facts without evidentiary support. The government filed a Response that included affidavits by Trooper Messer and Agents Bane and Lotvedt setting forth the above-summarized background facts. No material facts were in dispute. The district court denied the motion without an evidentiary hearing.

## II.

Diaz-Quintana argues on appeal, as he did to the district court, that Trooper Messer and the Border Patrol agents violated the Fourth Amendment by unreasonably prolonging a valid traffic stop for over twenty-four hours to investigate Diaz-Quintana's immigration status, thereby converting the stop into a *de facto* arrest and custodial detention without probable cause. Diaz-Quintana concedes that Trooper Messer's traffic stop was justified. Incident to that stop, Messer could "request [Diaz-Quintana's] driver's license and registration . . . conduct computer searches to investigate the driver's criminal history and . . . make inquiries as to [his] destination and purpose," and could detain him "as long as reasonably necessary to conduct these activities and to issue a warning or citation." United States v. Jones, 269 F.3d 919, 924-25 (8th Cir. 2001). The government concedes that, after Trooper Messer issued the speeding ticket and the drug dog failed to alert, the only lawful basis for further prolonging Diaz-Quintana 's detention was "to verify his legal status in the United States." The issue, then, turns on issues of immigration law enforcement.

An alien present in this country who was inadmissible when he entered is deportable. 8 U.S.C. § 1227(a)(1)(A) & (B). "A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime." INS v. Lopez-Mendoza, 468 U.S. 1032, 1038 (1984). An alien may be arrested and detained pending a decision whether he is to be removed "[o]n a warrant issued by the Attorney General." 8 U.S.C. § 1226(a). In addition, a Border Patrol agent acting without a warrant is authorized -

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) . . . to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of

-4-

any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrestee shall be taken without unnecessary delay . . . before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

8 U.S.C. § 1357(a). Because the Fourth Amendment applies to arrests of illegal aliens, the term "reason to believe" in § 1357(a)(2) means constitutionally required probable cause. See Babalu v. INS, 665 F.2d 293, 298 (3d Cir. 1981); Tejeda-Mata v. INS, 626 F.2d 721, 725 (9th Cir. 1980); United States v. Cantu, 519 F.2d 494, 496 (7th Cir.) cert. denied, 423 U.S. 1035 (1975); Au Yi Lau v. INS, 445 F.2d. 217, 222 (D.C. Cir.), cert. denied, 404 U.S. 864 (1971). Accord United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975) (the Fourth Amendment, as construed in Terry v. Ohio, 392 U.S. 1 (1968), applies to warrantless seizures of aliens).

The Attorney General's regulations implementing 8 U.S.C. § 1357(a) carefully distinguish between warrantless arrests for the purpose of commencing civil deportation proceedings, and warrantless arrests for criminal violations of the immigration laws:

**[8 C.F.R.] § 287.8 Standards for enforcement activities. . . .**

(b) *Interrogation and detention not amounting to arrest.* (1) . . . An immigration officer, like any other person, has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away.

(2) If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is . . . an alien illegally in the United States, the immigration officer may briefly detain the person for questioning.

\*    \*    \*    \*    \*

(c) *Conduct of arrests* . . . .

(2) *General procedures.* (i) An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested . . . is an alien illegally in the United States.

(ii) A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.

\* \* \* \* \*

(iv) With respect to an alien arrested and administratively charged with being in the United States in violation of law, the arresting officer shall adhere to the procedures set forth in 8 CFR 287.3 if the arrest is made without a warrant.

(v) With respect to a person arrested and charged with a criminal violation of the laws of the United States, the arresting officer shall advise the person of the appropriate rights as required by law . . . .

(vi) Every person arrested and charged with a criminal violation of the laws of the United States shall be brought without unnecessary delay before a United States magistrate judge [or other appropriate judicial officer]. Accordingly, the immigration officer shall contact an Assistant United States Attorney to arrange for an initial appearance.[1]

**§ 287.3  Disposition of cases of aliens arrested without warrant.**

(a) *Examination.* An alien arrested without a warrant of arrest . . . will be examined by an officer other than the arresting officer.

---

[1]Because arrests under § 1357(a)(2) for the purpose of deporting an illegal alien result in "civil" or "administrative" removal proceedings, aliens held in that type of custody are not entitled to the protections of Rule 5(a) of the Federal Rules of Criminal Procedure. See United States v. Encarnacion, 239 F.3d 395, 398-99 (1st Cir. 2001), and cases cited.

(b) *Determination of proceedings.* If the examining officer is satisfied that there is prima facie evidence that the arrested alien . . . is present in the United States in violation of the immigration laws, the examining officer will refer the case to an immigration judge for further inquiry . . . order the alien removed . . . or take whatever other action may be appropriate or required under the laws or regulations applicable to the particular case.

\* \* \* \* \*

(d) *Custody procedures.* Unless voluntary departure has been granted . . . a determination will be made within 48 hours of the arrest . . . whether the alien will be continued in custody or released on bond or recognizance . . . ."

In this case, Diaz-Quintana was initially questioned regarding his identity as part of a valid traffic stop. Trooper Messer reasonably contacted the Border Patrol to determine the validity of Diaz-Quintana's Mexican driver's license. Agent Bane spoke with Diaz-Quintana by telephone and learned he was a Mexican national who claimed to have entered the country legally but had no legitimizing documents in his possession. Bane reasonably conducted prompt preliminary record checks of Diaz-Quintana's reported name, entry, and immigration status. When those checks produced no information for the name and date of birth provided by Diaz-Quintana, and no confirmation of his claim of legal entry, Agent Bane had "reason to believe" (i.e., probable cause to believe) that the person Messer stopped for speeding was an alien subject to deportation because illegally present in this country. Agent Bane also had "reason to believe that [Diaz-Quintana was] likely to escape before a warrant [could] be obtained" and therefore had probable cause to make a warrantless "administrative" arrest for deportation proceedings under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(iv). See United States v. Torres-Lona, 491 F.3d 750, 56 (8th Cir. 2007), cert. denied, 552 U.S. 1121 (2008); Ojeda-Vinales v. INS, 523 F.2d 286, 288 (2d Cir. 1975).

On appeal, Diaz-Quintana argues that the district court committed plain error in not holding an evidentiary hearing at which he could have contested the averrals in Agent Bane's affidavit. We disagree. In his reply memorandum to the district court, Diaz-Quintana did not challenge Agent Bane's factual assertions, including his description of the Border Patrol record checks conducted at his request. Rather, Diaz-Quintana argued, incorrectly, that 8 U.S.C. § 1357(a)(2) only applies to warrantless administrative arrests at the time an alien enters the country. In these circumstances, the district court did not abuse its discretion, much less commit plain error, in relying on Agent Bane's affidavit without a hearing.

Alternatively, Diaz-Quintana argues that his lengthy administrative detention before the Border Patrol uncovered evidence of illegal re-entry violated his Fourth Amendment rights as construed in United States v. Flores-Sandoval, 422 F.3d 711, 714 (8th Cir. 2005), and United States v. Guevara-Martinez, 262 F.3d 751, 755 (8th Cir. 2001). But in those cases, probable cause to believe that the defendants were deportable aliens was acquired *after* their illegal arrest and detention. Here, the critical issue is whether Agent Bane acquired probable cause during the valid traffic stop to take Diaz-Quintana into administrative custody as a deportable alien. Diaz-Quintana admitted he was a Mexican national. Though he provided a superficially plausible explanation for not having immigration documents in his possession -- that he forgot to bring his passport and visa with him on the trip -- a preliminary search of Border Patrol records returned no immigration history, port-of-entry crossing, or visa information for the name Diaz-Quintana provided. The government should have made a better showing that the databases preliminarily searched by Agent Bane and the Grand Forks Patrol Dispatch are sufficiently thorough and complete to permit a reasonable Border Patrol Agent to infer that Diaz-Quintana was present in the country illegally. But Bane, a Border Patrol Agent with nine years experience, drew that inference, and Diaz-Quintana's reply memorandum did not challenge the data base or the inference Agent Bane drew. On this record, the Border Patrol made a sufficient showing of probable cause to believe that Diaz-Quintana was a deportable alien.

**III.**

Denial of the motion to suppress follows inexorably from our conclusion that Agent Bane had probable cause to take Diaz-Quintana into administrative custody at the conclusion of the traffic stop. First, Bane was authorized to make the arrest. See 8 C.F.R. § 287.5(c)(1). Second, Trooper Messer was authorized to assist Agent Bane in detaining Diaz-Quintana. See 8 U.S.C. § 1357(g)(10)(B). Third, following the arrest, Diaz-Quintana was examined by Agent Lotvedt, an officer other than the arresting officer, as 8 C.F.R. § 287.3(a) required.

Fourth, Agent Lotvedt followed proper procedures when he examined Diaz-Quintana to verify his identity and entered his fingerprints into the Border Patrol's IAFIS/IDENT system. See 8 C.F.R. § 241.8(a)(2). After twenty-six hours of administrative custody, the Border Patrol gathered probable cause to believe that Diaz-Quintana was guilty of a criminal violation of 8 U.S.C. § 1326. At that point, he was advised of his Miranda rights, as 8 C.F.R. § 287.8(c)(2)(v) required, and agreed to answer further questions. Diaz-Quintana does not argue that the warnings required by Miranda must be given before an alien in administrative custody is examined to determine whether he is deportable, an issue we noted but did not decide in Torres-Lona, 491 F.3d at 758. See Lopez-Mendoza, 468 U.S. at 1039.

Fifth, Agent Lotvedt's examination at the Border Patrol Station in Portal, North Dakota, and the Border patrol's determination whether to keep Diaz-Quintana in custody, were completed well within the 48 hours following his arrest prescribed in 8 C.F.R. § 287.3(d). Though a Terry stop justified by reasonable suspicion of a criminal violation "can not continue for an excessive period of time, or resemble a traditional arrest," Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 185-86 (2004) (citations omitted), this principle does not apply to detention following an administrative arrest based upon probable cause that an alien is deportable. Detention during deportation proceedings is a constitutionally valid aspect of the deportation

process. "As we said more than a century ago, deportation proceedings would be [in] vain if those accused could not be held in custody pending the inquiry into their true character." Demore v. Kim, 538 U.S. 510, 523 (2003) (quotation omitted). Therefore, the government did not need to prove that use of the IAFIS/IDENT system was the quickest means of investigation reasonably available to determine whether Diaz-Quintana was in the country illegally.

For the foregoing reasons, the judgment of the district court is affirmed.

_____