# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1742

_____

United States of America

*Plaintiff - Appellee*

v.

Cody Michael Smith

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: October 23, 2015
Filed: April 14, 2016

_____

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

After reserving the right to challenge the warrantless search of his residence, Cody Smith pled guilty to one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(9). Smith appeals the district court's[1] denial of his

_____

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota, adopting the report and recommendations of the

motion to suppress, arguing the physical evidence seized from his residence is fruit of an illegal entry into his home in violation of his Fourth Amendment rights. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

I.

On April 26, 2013, the Sioux Falls Police Department received a call from Jennifer Saarloos, a resident of Changes and Choices half-way house, regarding a well-being check on Alexis Wallace, another resident of the half-way house. Saarloos reported that she was concerned Wallace was being held against her will by her ex-boyfriend, Smith, because she did not return to the half-way house as scheduled at 5:00 p.m. The operator asked if Smith was known to have any weapons on him, to which Saarloos replied, "I'm sure of it, I'm sure." When asked why she believed Smith was holding Wallace against her will, Saarloos responded that a no-contact order existed between Smith and Wallace, that Smith was known to become "very, very, very angry," and that Smith was a known drug user.

At 7:49 p.m., Officers Sandgren, Van Ravenswaay, and Lieuwen arrived at Smith's home in response to the call. Sandgren explained to the other officers that he had been recently dispatched to the same location in response to a report that a male suspect was discharging firearms outside the home. At the time the officers reported to the scene, Sandgren believed Smith was the same individual police had responded to previously; however, he later discovered the individual was a prior resident and was not Smith. The officers knocked on Smith's door at 7:52 p.m. Smith answered the door and Sandgren asked, "Is Alexis here?" Smith responded that Wallace was not at the home. Sandgren explained that Wallace had not returned to the half-way house as scheduled and the officers had reason to believe she was at

Honorable John E. Simko, United States Magistrate Judge for the District of South Dakota.

-2-

Smith's home. Smith refused to give consent to the police to search for Wallace in his home and demanded the officers obtain a search warrant before he would allow them to enter his home.

The officers returned to their patrol car and discussed the situation. The officers radioed in to dispatch to check for Wallace at the local jail, hospitals, detox facilities, and similar locations. Sandgren told his fellow officers that they were merely "guessing" whether Wallace was inside the apartment, but expressed his belief that Smith would not allow them inside the home regardless of Wallace's presence based on the prior incident at the location. Dispatch contacted the officers between 7:58 and 8:00 p.m., reporting Wallace was not present at the other locations and that Smith had outstanding, unrelated warrants for his arrest.

Van Ravenswaay returned to his patrol car and called Saarloos at 8:03 p.m to obtain more information. Saarloos reported that Wallace left the half-way house around 4:25 p.m. and that Smith had been overheard yelling at Wallace on the phone that day. Saarloos further indicated that Wallace went to Smith's home because some of her personal belongings were there but told Saarloos she would return by 5:00 p.m. Saarloos also stated that other half-way house residents had tried to contact Wallace but no one had heard from her since she left the house. Sandgren and Lieuwen discussed Smith's appearance while Van Ravenswaay was away on the call with Saarloos. Sandgren commented that "it doesn't even look like him, the same guy." The officers also remarked that "the whole shape of his face changed" and "he's got to be using meth." When Van Ravenswaay returned, he relayed the additional information from Saarloos, and Sandgren requested additional police to be dispatched to the location.

At 8:13 p.m., the officers observed Smith emerge from his home to take out trash. The officers promptly arrested Smith on the outstanding warrants and placed him in Sandgren's patrol car. Smith again stated that police could not enter his home

without a warrant. Sandgren responded, "We're going in the house," based on information Wallace was in the home and that the police had an "obligation to check to make sure she's safe." At 8:17 p.m., Officer Winninger arrived as backup. Sandgren began to brief Winninger on the situation, then noticed someone look out the back window of Smith's home. Shortly thereafter, the officers approached the front door, announced their presence, and entered the residence. The police called out for Wallace, but she did not immediately respond. Wallace indicated she was in the bedroom approximately thirty seconds later. Sandgren testified that Wallace was not restrained when the officers located her and that Wallace told officers the only thing that had prevented her from leaving the home was Smith.

At the time they located Wallace in the bedroom, the officers observed an AK-47 partially covered by a bed sheet. The officers spent approximately one hour on the scene questioning Wallace and Smith before leaving with both of them in custody. The officers also took possession of the AK-47 and other evidence found in the home. While driving to the police station, Sandgren learned Smith was not the individual he previously encountered at the same location.

Smith was indicted for possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(9). Smith moved to suppress the evidence found in his home. The district court denied the motion to suppress, concluding the officers lawfully entered Smith's home pursuant to the community caretaking exception to the warrant requirement and that because the officers were lawfully on the premises, the firearm was admissible under the plain view doctrine. Smith pleaded guilty to being a felon in possession of the firearm but preserved his right to appeal the district court's denial of the motion to suppress. The district court sentenced Smith to 41 months imprisonment. This timely appeal followed.

II.

On appeal, Smith argues the district court erred in denying his motion to suppress. "A mixed standard of review applies to the denial of a motion to suppress evidence." United States v. Williams, 777 F.3d 1013, 1015 (8th Cir. 2015). We review the district court's findings of fact for clear error and the denial of the suppression motion de novo. Id.; United States v. Orozco, 700 F.3d 1176, 1178 (8th Cir. 2012).

The Fourth Amendment provides, in relevant part, "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated." "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable government intrusion.'" Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)). While it is a basic principle of the Fourth Amendment that warrantless searches and seizures inside a home are presumptively unreasonable, the ultimate touchstone of the Fourth Amendment is "reasonableness," and it follows that the warrant requirement is subject to certain exceptions. Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (citing Flippo v. West Virginia, 528 U.S. 11, 13 (1999) (per curiam)).

One such exception applies when police officers engage in a community caretaking function. Cady v. Dombrowski, 413 U.S. 433, 441 (1973). The Supreme Court has long described the "community caretaking functions" of law enforcement as activities that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. This Circuit has recognized that such a "community caretaker" classification may justify noninvestigatory searches and seizures in certain limited situations. United States v. Harris, 747 F.3d 1013, 1017 (8th Cir. 2014) (compiling cases that have applied the community caretaker doctrine to noninvestigatory seizures). Community caretaking

functions are performed by law enforcement to "help those in danger." United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006) (citing Cady, 413 U.S. at 441). "A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention." Id. (citing Mincey v. Arizona, 437 U.S. 385, 392-93 (1978)). The "reasonable belief" required under the community caretaker doctrine "is a less exacting standard than probable cause." Id. (citing Maryland v. Buie, 494 U.S. 325, 336-37 (1990)). A search or seizure under the community caretaking function is reasonable if the governmental interest in law enforcement's exercise of that function, based on specific and articulable facts, outweighs the individual's interest in freedom from government intrusion. Harris, 747 F.3d at 1017.

We first examine whether the officers had a reasonable belief that Wallace was in danger such that their entry into Smith's home was a justifiable exercise of their community caretaking function. We look to the facts known to the officers at the time they made the decision to enter Smith's home in search of Wallace. See Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006) (holding that, in Fourth Amendment claims, reasonableness is examined from the perspective of a "reasonable officer on the scene, rather than with the 20/20 vision of hindsight" (quoting Tennessee v. Garner, 471 U.S. 1, 8-9 (1985))).

The specific, articulable facts known to the officers at the time they entered the residence include the following facts, based on Saarloos's calls and information from dispatch. Wallace left the half-way house and had not returned by 5:00 p.m., the time she indicated she would return. Saarloos stated during her first call to 911 that Smith may be holding Wallace at his home against her will. Saarloos also provided background information on Smith and Wallace's previous dating relationship, including the existence of a no-contact order between them. The officers further learned from dispatch that other officers were unable to locate Wallace at a number of other locations. Sandgren believed he knew Smith from the previous call to the

-6-

same location–an incident that led him to believe Smith was armed and dangerous, especially when coupled with Saarloos's report that she was "sure" Smith was armed. Sandgren later told the officers Smith's appearance had changed significantly. After Smith denied any contact with Wallace, Saarloos told Van Ravenswaay that Smith had been overheard yelling at Wallace on the phone earlier that day. Further, only Smith responded to the officer's initial knock on the door. Wallace had not responded to any phone calls or text messages since she left the half-way house, which was over three hours prior to the time the officers entered Smith's residence. Finally, Sandgren noticed a person's face at the back window of Smith's home after Smith told officers Wallace was not at his home.

We are satisfied that the officers acted in their community caretaking function when they entered Smith's residence. The circumstances resemble those in Harris and Quezada, in which officers responded to potential emergency situations to aid members of the community. See Harris, 747 F.3d at 1018-20 (holding that community caretaker doctrine applied when officers responded to a call that a gun was sliding out of the pocket of a sleeping individual at a bus station); Quezada, 448 F.3d at 1007-08 (holding that community caretaker doctrine applied when officer encountered an emergency situation while serving a child protection order). The officers in the present case received a call from a concerned member of the community regarding the safety of another community member. On the scene, the officers learned further details indicating serious concern for Wallace's safety and establishing multiple reasons why she would be at Smith's residence and held against her will or in danger.

We must next weigh the government's interests in the officers' entry against Smith's right to be free from government intrusion. Smith contends that following his arrest, any emergency situation that the police officers may have believed existed inside the residence was extinguished and points to Smith v. Kansas City, Missouri Police Department, 586 F.3d 576 (8th Cir. 2009), as apposite. However, in Smith, the

officers observed no suspicious activity to confirm their belief that a domestic violence suspect was in a home with a child. 586 F.3d at 580-81. The officers in Smith entered the residence to look for unknown, dangerous individuals as part of a protective sweep. Id. Here, the officers did not enter Smith's residence as a protective sweep. As far as the officers reasonably knew at the time, Wallace could have been incapacitated within the residence in any number of ways that would prevent her from emerging from the residence following Smith's arrest. Wallace's lack of response to any calls or messages on her cell phone since leaving the half-way house further suggested that she was unable to respond. The fact that officers saw a face in the window undermined Smith's claim that he was the only person in the home at the time and a reasonable officer on the scene could believe the person seen in the window required their assistance. The justification for the officers' entry arises from their obligation to help those in danger and ensure the safety of the public. See Quezada, 448 F.3d at 1007; Samuelson, 455 F.3d at 877. The district court found that, as in Quezada, "a reasonable officer . . . could conclude that someone was inside but was unable to respond for some reason." 448 F.3d at 1008. We agree and conclude that the officers reasonably believed an emergency situation existed that required their immediate attention in the form of entering Smith's residence to search for Wallace.

Further, we conclude the scope of the encounter was carefully tailored to satisfy the purpose. See Harris, 747 F.3d at 1017 (maintaining that the scope of the encounter must conform to the purpose of the initial detention). The officers entered Smith's residence for the purpose of locating Wallace. They first announced their presence at the entrance of the home but received no response. Within thirty seconds, Wallace called out and indicated she was "in the bedroom." The officers went to the bedroom and began speaking with Wallace there. Smith does not argue the officers ventured beyond the bedroom once inside his home.

The firearm at issue in this case was lying on the bed in the bedroom where Wallace was located. It was only partially covered by a bed sheet. The plain view doctrine therefore applies. See Quezada, 448 F.3d at 1008 (holding that a shotgun protruding from beneath a man lying on the ground was admissible under the plain view doctrine). The Supreme Court has long held that "under certain circumstances the police may seize evidence in plain view without a warrant," including situations "[w]here the initial intrusion that brings the police within plain view of such [evidence] is supported . . . by one of the recognized exceptions to the warrant requirement." Arizona v. Hicks, 480 U.S. 321, 326 (1987) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971) (plurality opinion)). Because the officers had a lawful basis for entering Smith's apartment under their function as community caretakers, the firearm laying on the bed in the room in which Wallace was found is admissible under the plain view doctrine.

III.

Accordingly, we affirm the district court's denial of Smith's motion to suppress.

_____