# United States Court of Appeals
### For the Eighth Circuit

_____

No. 19-2512

_____

Teresa M. Graham

*Plaintiff - Appellant*

v.

Sgt. Shannon L. Barnette; Officer Amanda Sanchez; Officer Mohamed Noor; City of Minneapolis

*Defendants - Appellees*

_____

State of Minnesota

*Amicus Curiae*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: July 12, 2021
Filed: July 16, 2021

_____

Before GRUENDER, WOLLMAN, and KOBES, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Teresa Graham sued Sergeant Shannon Barnette, Officer Mohamed Noor, and Officer Amanda Sanchez ("the officers"), as well as the City of Minneapolis ("the City"), under 42 U.S.C. § 1983 and Minnesota state law after the officers entered her home, seized her, and transported her to a hospital for a mental-health evaluation, all without a warrant. The district court[1] granted the officers and the City summary judgment. Graham appealed. We affirmed. *Graham v. Barnette*, 970 F.3d 1075, 1082 (8th Cir. 2020). The Supreme Court subsequently vacated our judgment and remanded the case for reconsideration in light of *Caniglia v. Strom*, 593 U.S. ---, 141 S. Ct. 1596 (2021). *Graham v. Barnette*, 593 U.S. ---, 2021 WL 2301963, at *1 (U.S. June 7, 2021). We have done so and once again affirm. Our prior opinion in this case is hereby vacated, and this opinion is substituted for it.

## I.

"We recount the facts of this case in the light most favorable to [Graham], the non-moving party." *Meehan v. Thompson*, 763 F.3d 936, 938 (8th Cir. 2014). In so doing, we rely on the factual findings of the district court, *see Saylor v. Nebraska*, 812 F.3d 637, 642 (8th Cir. 2016), as well as audio and video recordings of the relevant events, *see Meehan*, 763 F.3d at 938.

At approximately 10:00 a.m. on May 25, 2017, Graham called 911 and reported that a man was smoking marijuana on a retaining wall behind her home. A City police officer arrived at Graham's address later that morning, saw no one, and left without following up with Graham. Several hours later, Graham called the police again and left a voicemail for the precinct's commander, complaining that officers did not respond to her emergency call and referencing an email she sent earlier in the day regarding the police department's failure to respond to a different report she had filed. Around 6:00 p.m., a police officer returned Graham's call and

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

informed her that officers had investigated her complaint regarding the unidentified man in her backyard.

Things then took an unusual turn. At 6:11 p.m., an anonymous informant claiming to be Graham's cousin called 911 and reported that Graham had called him at work to threaten him and his family. He told the 911 operator that "this is not an emergency" and that he "did not think [Graham] was going to do anything." Even so, he requested a "welfare check" because he believed Graham had a history of mental-health issues. The operator summarized the call for the responding officers in a comment to the incident report that read, "CLRS COUSIN WHO JUST CALLED HIM AT WORK AND THREATENED HIM AND HIS FAMILY." The operator also noted that the individual requested a welfare check on Graham and that Graham's mental-health diagnosis was unknown.

Two hours later, Officers Noor and Sanchez arrived at Graham's home. Officer Sanchez recorded the encounter using a body camera. When Graham answered the door, she demanded to know who requested the welfare check, claimed she was being slandered, retrieved her phone to videotape the officers, accused the police of harassing her because of her earlier complaints, and then demanded that the officers leave. The officers apologized for disturbing Graham, left her home, and noted in their incident report that they were unable to "check on her welfare" because of her insistence that they leave but concluded she "appeared to be AOK."

But the interaction between Graham and the police did not end there. At 9:05 p.m., a 911 operator reported that Graham had called three more times since the welfare check. Graham first called at 8:20 p.m. to complain about what she viewed as the officers harassing her in retaliation for her previous calls. The operator described Graham as agitated as well as aggressive and suggested that Graham was not making sense. Approximately fifteen minutes later, Sergeant Barnette returned Graham's call, and the two spoke briefly about Graham's concerns. At 8:40 p.m., Graham called 911 again, asking to be connected to the Edina police department. Twenty minutes later, she called once more and made the same request.

At this time, Sergeant Barnette ordered Officers Noor and Sanchez to take Graham into custody for an emergency mental-health evaluation as authorized by Minnesota's Civil Commitment and Treatment Act ("MCCTA"), Minn. Stat. § 253B.05, subd. 2(a) (2017), which permits an officer to seize a person for an emergency mental-health evaluation "if the officer has reason to believe . . . that the person is mentally ill . . . and in danger of injuring self or others if not immediately detained." In ordering the seizure, Sergeant Barnette relied on the officers' interactions with Graham throughout the day, the anonymous report that Graham had threatened her cousin, and Sergeant Barnette's own previous interactions with Graham through which Sergeant Barnette claimed to be aware of "some mental health history" and a history of restraining orders.

The officers arrived for a second time at Graham's home at 9:40 p.m. By this time, one of Graham's family members—a state police officer—had warned the Edina police department that Graham may fight with police, and Sergeant Barnette decided to join Officers Noor and Sanchez at Graham's home. The officers wore body cameras that recorded the encounter.

When the officers arrived, Graham opened the interior front door but left her storm door locked and shut. Graham appeared angry, told the officers that she did not call them for help, demanded that they leave her property, and slammed the front door. Sergeant Barnette then removed the screen from the storm door to allow entry should Graham reopen the interior door. With the interior door closed, Graham told the officers she was fine. She then called 911 to complain that the officers would not leave. After an extended discussion with the officers through the door, Graham reopened the door, at which point the officers entered her home through the then-screenless storm door and held Graham by each arm. During the encounter in her home, Graham did not resist or threaten the officers, but she did criticize them and threaten to sue them, alleging they were kidnapping her because of her complaints.

After several minutes, the officers placed Graham in an ambulance, noting in the relevant paperwork that they took Graham into custody because she

-4-

"continuously called 911 and per dispatchers was verbally agitated and not making sense." Graham was then transported to Southdale Fairview Hospital, where she was evaluated and subsequently discharged after an examination demonstrated that, while she exhibited "some paranoid behavior" and was "royally pissed," she was "somewhat rational" and, according to the examining physician, not "hold-able."

Graham brought suit, asserting (as relevant here) claims under 42 U.S.C. § 1983 on the basis that the officers violated her Fourth Amendment rights by conducting an unreasonable search and seizure and that they violated her First Amendment rights by arresting her in retaliation for protected speech.[2] She also brought § 1983 claims against the City under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), alleging that the City's policy regarding seizures for emergency mental-health evaluations caused the officers' unconstitutional conduct and that the City's failure to train the officers resulted in their unconstitutional conduct. Finally, Graham brought Minnesota state-law claims against the officers for false imprisonment, battery, assault, and negligence.

The district court entered summary judgment in favor of the officers, granting them qualified immunity on Graham's Fourth Amendment claims, finding that Graham had not established a triable issue of fact regarding her retaliatory-arrest claim, and granting the officers statutory and official immunity on Graham's state-law claims. The district court also entered summary judgment in favor of the City, determining that the City's policy concerning seizures for emergency mental-health evaluations was not facially unconstitutional and that Graham did not plead facts sufficient to support a claim for failure to train.

Graham appealed. We previously affirmed the district court's judgment. *See Graham*, 970 F.3d at 1082. Graham then petitioned for a writ of certiorari, arguing

---

[2]Graham also raised claims of excessive force, property damage, and conspiracy before the district court, but she did not raise them on appeal and has thus abandoned them. *See Griffith v. City of Des Moines*, 387 F.3d 733, 739 (8th Cir. 2004).

-5-

(as relevant here) that the doctrine we relied on to find that the officers' warrantless entry was reasonable under the Fourth Amendment—the so-called community-caretaking or community-caretaker exception—did not apply to the home.[3]  While Graham's petition was pending, the Supreme Court decided *Caniglia*, where it explained that this "exception" is not actually a "standalone doctrine that justifies warrantless searches and seizures in the home."  141 S. Ct. at 1598.  Subsequently, it granted Graham's certiorari petition, vacated our prior judgment in Graham's appeal, and remanded the matter to us for further consideration in light of *Caniglia*.  *Graham*, 2021 WL 2301963, at *1.  We have reconsidered this appeal in light of *Caniglia*, and we once again affirm the district court's judgment.

## II.

We first consider the district court's grant of summary judgment to the officers and the City on Graham's § 1983 claims.  "We review the district court's grant of summary judgment and qualified immunity rulings de novo."  *Samuelson v. City of New Ulm*, 455 F.3d 871, 875 (8th Cir. 2006).  Summary judgment is proper if, when viewing the facts in the light most favorable to the nonmoving party, *see Mullenix v. Luna*, 577 U.S. ---, 136 S. Ct. 305, 307 (2015) (per curiam), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[3]As she did before us, Graham also argued in her certiorari petition that the doctrine of qualified immunity should be modified or "overruled."  This argument remains foreclosed by Supreme Court and Eighth Circuit precedent. *See, e.g.*, *White v. Pauly*, 580 U.S. ---, 137 S. Ct. 548, 551 (2017) (per curiam); *Lane v. Nading*, 927 F.3d 1018, 1022 (8th Cir. 2019).

## A.

Graham first argues that the officers violated her clearly established Fourth Amendment right to be free from an unreasonable search by entering her home. Pre-*Caniglia*, the officers responded that their warrantless entry into her home was reasonable under the community-caretaking exception but that, even if it was not, they were entitled to qualified immunity as to this claim because it was not clearly established that their actions were unreasonable in the circumstances.

A law-enforcement officer is entitled to qualified immunity unless "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014). Due to the "dearth of community caretaking cases," the district court bypassed the first prong of the analysis, *see Reichle v. Howards*, 566 U.S. 658, 664 (2012), concluding instead that the law was not clearly established that the officers violated Graham's Fourth Amendment rights by entering her home without a warrant pursuant to the community-caretaking exception. Previously, we opted to affirm under the first prong, *see, e.g.*, *Greenman v. Jessen*, 787 F.3d 882, 887 & n.10 (8th Cir. 2015), concluding that the officers' warrantless entry was sufficiently justified and thus reasonable under the community-caretaking exception, *Graham*, 970 F.3d at 1084-86. But *Caniglia* rendered our prior rationale untenable insofar as it explained that "community caretaking" was not a "standalone doctrine" that could justify warrantless entry into the home. *See* 141 S. Ct. at 1598. Accordingly, we now affirm the district court's grant of summary judgment under the second prong of the qualified-immunity analysis.

For purposes of the second prong, we look to "the legal rules that were clearly established at the time" the action at issue was taken. *Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004) (internal quotation marks omitted); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (noting that this analysis turns on whether the unlawfulness of the official's actions was apparent "in the light of pre-existing law").

In other words, this inquiry "does not take into account later . . . changes in the law." *Jackson v. Humphrey*, 776 F.3d 1232, 1242 (11th Cir. 2015).

On May 25, 2017, it was well established in this circuit that the community-caretaking exception was a standalone doctrine that alone could justify warrantless entry into a home. *See, e.g.*, *United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016); *Burke v. Sullivan*, 677 F.3d 367, 372 (8th Cir. 2012); *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006). And, in the circumstances present here, the officers' warrantless entry did not violate Graham's Fourth Amendment rights under our then-extant community-caretaking jurisprudence. As we previously explained:

> Affording the officers "substantial latitude in interpreting and drawing inferences from factual circumstances," *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997), we . . . conclude that the warrantless entry into Graham's home was justified by a reasonable belief that Graham was experiencing a mental health emergency and might harm herself or others if not detained, *see Quezada*, 448 F.3d at 1007. The officers could reasonably believe that Graham had recently made some sort of threat to her cousin; she had called 911 five times that day and three times within two hours; and the operator had noted that she was "not making sense" and that each time she was argumentative, uncooperative, and agitated; Sergeant Barnette knew Graham had a history of restraining orders; and a second member of Graham's family warned the police department that she may fight the officers. When the officers arrived at her home the second time, Graham was agitated and refused to talk with them. She initially stated that she had not called the police—even though Sergeant Barnette identified herself and explained that she and Graham had spoken shortly before. When the officers tried to enter, Graham slammed the door and called 911 again even as the officers attempted to explain, as one officer put it, "we are 911."
>
> "When viewed collectively, these facts could lead a reasonable police officer to conclude there was either a threat of violence or an emergency requiring attention." *Burke*[, 677 F.3d at 372]. . . .

Finally, once inside the home, the officers did not expand the scope of their search beyond that which was justified by the emergency. "The justification for the officers' entry ar[ose] from their obligation to help those in danger and ensure the safety of the public," and the officers "carefully tailored" "the scope of the encounter" so as to "satisfy th[at] purpose." *Smith*, 820 F.3d at 361-62. Upon entry, they immediately located Graham, secured her person so she could not harm herself or anyone else, and limited their entry to this purpose rather than, say, searching throughout the rest of her home or rummaging through her belongings. *See id.* (explaining that the scope of the entry and search in the emergency-aid context must be limited to determining whether an emergency exists).

The officers thus acted reasonably when entering Graham's home.

*Graham*, 970 F.3d at 1085-86.


We need not and do not unpack today *Caniglia*'s full ramifications for our community-caretaking jurisprudence. *Cf. Caniglia*, 141 S. Ct. at 1603 (Kavanaugh, J., concurring) (noting that the "Fourth Amendment issue" presented by warrantless home entries done for noninvestigatory, "community caretaking" purposes is "more labeling than substance"). Rather, we decide only that the officers' warrantless entry was reasonable under "the legal rules that were clearly established" in this circuit on May 25, 2017. *See Davis*, 375 F.3d at 711 (internal quotation marks omitted). While *Caniglia* made clear that "community caretaking" was not its own Fourth Amendment exception that alone could justify warrantless entry into the home, "*Caniglia* did not address" what "rights were clearly established" under "pre-existing circuit law." *Luer v. Cnty. of St. Louis*, --- F.4th ---, 2021 WL 2285499, at *1 (8th Cir. June 3, 2021). Accordingly, we affirm the district court's grant of summary judgment on the basis of qualified immunity to the officers with respect to Graham's Fourth Amendment warrantless-entry claim.

B.

Graham next contends that the officers violated her Fourth Amendment right to be free from unreasonable seizures when they seized her for a mental-health evaluation without probable cause to believe that she was a danger to herself or others. She also argues that probable cause was the clearly established standard at the time, meaning the officers are not entitled to qualified immunity as to this claim. Alternatively, she argues that even if this circuit's standard for evaluating mental-health seizures is a lower, "reasonable belief" standard, the officers still lacked such justification to seize her for a mental-health evaluation under clearly established law and thus should not be granted qualified immunity even under this lower standard.

Although the district court agreed with Graham that the officers needed probable cause of dangerousness to seize her for a mental-health evaluation and lacked such probable cause, it found that the probable-cause standard was not clearly established. Accordingly, the district court granted the officers qualified immunity as to this claim. On appeal, the officers (joined by the State of Minnesota as *amicus curiae*) contended that, under circuit precedent, the officers needed only reasonable belief of dangerousness to seize her, and the officers argued that they had such reasonable belief here. The officers also argued that they were entitled to qualified immunity as to this claim because their seizure of Graham did not violate clearly established law.

Previously, we agreed with the district court that, although our case law had engendered some confusion about the proper standard, "only probable cause that a person poses an emergent danger . . . to herself or others" could justify a warrantless mental-health seizure. *Graham*, 970 F.3d at 1088-89. But, given the ambiguity in our case law about this issue, we held that, even if the officers lacked the requisite probable cause, they could still be entitled to qualified immunity because the probable-cause standard was not clearly established. *Id.* at 1090. And we ultimately concluded that the officers were entitled to qualified immunity because their actions

did not violate clearly established law under the lower reasonable-belief standard that some of our precedents had suggested applied here. *Id.* at 1090-91.

In our prior discussion of this issue, we used the "community caretaking" label to discuss the standard under which warrantless mental-health seizures are permissible under the Fourth Amendment. *Id.* at 1088. Now that *Caniglia* has made clear that "there is no overarching 'community caretaking' doctrine," 141 S. Ct. at 1600 (Alito, J., concurring), our use of that label seems to be a category error. That said, the Court in *Caniglia* "refrain[ed]" from addressing generally the standards governing "emergency seizures for psychiatric treatment, observation, or stabilization." *Id.* at 1601 (Alito, J., concurring). Thus, *Caniglia* did not affect the substance of our reasoning or holdings on the issues Graham raises regarding her warrantless seizure. Accordingly, we once again conclude that (1) probable cause of dangerousness is the requisite standard; (2) assuming the officers lacked probable cause here, they may still be entitled to qualified immunity given the ambiguity in our case law about the requisite standard; and (3) the officers are entitled to qualified immunity because their actions did not violate clearly established law under the lower reasonable-belief standard some of our precedents suggested was the requisite standard.

1.

First, we again conclude that probable cause of dangerousness is the standard that must be met for a warrantless mental-health seizure to be reasonable under the Fourth Amendment.

At least nine of our sister circuits have held that the Fourth Amendment requires probable cause that a person is mentally ill and dangerous to herself or others for a seizure for an emergency mental-health evaluation to be reasonable. *See, e.g.*, *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016); *Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir. 2012); *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011); *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324,

334 (4th Cir. 2009); *Meyer v. Bd. of Cnty. Comm'rs of Harper Cnty.*, 482 F.3d 1232, 1239 (10th Cir. 2007); *Ahern v. O'Donnell*, 109 F.3d 809, 817 (1st Cir. 1997); *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997); *Sherman v. Four Cnty. Counseling Ctr.*, 987 F.2d 397, 401-02 (7th Cir. 1993); *Maag v. Wessler*, 960 F.2d 773, 775-76 (9th Cir. 1991) (per curiam); *see also Cole v. Town of Morristown*, 627 F. App'x 102, 106-07 (3d Cir. 2015) (upholding as reasonable a mental-health seizure because "the police . . . had probable cause to believe" the plaintiff "was dangerous"); *In re Barnard*, 455 F.2d 1370, 1373-74 (D.C. Cir. 1971) (finding that a plaintiff was seized within the meaning of the Fourth Amendment when taken into custody for an involuntary mental-health evaluation and explaining that such seizures are unconstitutional "unless supported by probable cause"). These courts have uniformly determined that "a seizure of a person for an emergency mental health evaluation raises concerns that are closely analogous to those implicated by a criminal arrest, and both are equally intrusive." *See Pino v. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996).

Some of these circuits have thought we were first movers in this area, pointing to *Harris v. Pirch*, 677 F.2d 681 (8th Cir. 1982), while holding that the right to be free from seizures for an emergency mental-health evaluation without probable cause of dangerousness was clearly established. *See, e.g.*, *Maag*, 960 F.2d at 776. But neither *Pirch* nor our later cases are so clear. In *Pirch*, we determined that an officer was entitled to qualified immunity after effectuating a mental-health seizure, and in so doing we commented that "when a court evaluates police conduct relating to an arrest its guideline is good faith and probable cause." 677 F.2d at 686 (brackets omitted). But, because we were evaluating whether an officer complied with a Missouri statute that used the phrase "reasonable cause," *id.* at 684, we held that the officer was immune from suit because he acted in "good faith and had reasonable cause" to believe the plaintiff overdosed without explaining whether reasonable cause was as rigorous a standard as probable cause, *id.* at 689. *Compare Navarette v. California*, 572 U.S. 393, 404 (2014) (using "reasonable cause" and "reasonable suspicion" interchangeably to justify an investigative stop), *with Stacey v. Emery*, 97 U.S. 642, 646 (1878) ("If there was a probable cause of seizure, there was a

reasonable cause. If there was a reasonable cause of seizure, there was a probable cause.").

Since *Pirch*, we have never held that reasonable belief is sufficient, nor have we held that probable cause is required, to justify a mental-health seizure. We have instead suggested that reasonable belief is sufficient to justify some noninvestigatory seizures while intimating that probable cause is required in other instances.[4] *Compare Winters v. Adams*, 254 F.3d 758, 764, 766 (8th Cir. 2001) (upholding a brief detention of an intoxicated individual under the community-caretaking exception and analogizing the officers' decision to "investigate" and "briefly detain" to investigative stops), *Samuelson*, 455 F.3d at 874 (finding "objectively reasonable" the officers' decision to transport the plaintiff to a hospital for evaluation due to his "incoherent" statements *after* he was mistakenly arrested and in police custody for breaking into his own garage), *and Burke*, 677 F.3d at 372-73 (stating that a "brief detention" based on reasonable belief that it was necessary to secure the safety of an individual "was lawful"), *with Meehan*, 763 F.3d at 943 (articulating a reasonableness balancing test under the community-caretaking exception but framing the ultimate question as one concerning whether the facts at issue gave the officer acting "in his capacity as community caretaker" "probable cause to arrest" the individual), *and United States v. Harris*, 747 F.3d 1013, 1017, 1019 (8th Cir. 2014) (same).

---

[4]*Amicus* Minnesota argues that we rejected the probable-cause standard for emergency mental-health seizures in *Collins v. Bellinghausen*, 153 F.3d 591, 596 (8th Cir. 1998)*,* but this is not so. Instead, when evaluating the plaintiff's Fourth Amendment claim, we held that officers acted reasonably when they *entered* a home to seize a vulnerable adult that the officers "reasonably believe[d]" needed immediate aid. *Id.* And, in the context of evaluating the plaintiff's claim that the defendants violated her Fourteenth Amendment right to due process, we stated that the "probable cause" requirement necessary to justify the initiation of involuntary commitment proceedings under Iowa law was "irrelevant" to our analysis of what the Due Process Clause demands—an issue itself distinct from what the Fourth Amendment requires. *See id.*

We think the through line of these cases is straightforward. As in the criminal context of an investigative stop, when officers act in a noninvestigatory capacity, they may briefly detain an individual to ensure her safety and that of the officers or the public when the officer reasonably believes that an emergency exists requiring the officer's attention. But, as with other police functions, all seizures—whether brief detentions or arrests—done for noninvestigatory purposes are governed by the Fourth Amendment's reasonableness balancing test. As a result, the greater the intrusion on a citizen, the greater the justification required for that intrusion to be reasonable. Thus, if the detention evolves into an arrest, it must be justified by probable cause. This balancing test, ever attuned to the nature and quality of the intrusion, comports with the Supreme Court's instruction that reasonableness is the touchstone of the Fourth Amendment. *See Smith*, 820 F.3d at 360-62 (articulating a similar rule in the context of community-caretaking searches).

Our decision in *Harris* illustrates this point. There, we stated that a "seizure of a person by a police officer acting in the officer's noninvestigatory capacity is reasonable if the governmental interest in the police officer's exercise of [the officer's] community caretaking function, based on specific articulable facts, outweighs the individual's interest in being free from arbitrary government interference." 747 F.3d at 1017 (internal quotation marks omitted). But we also explained that even when an officer is operating in a noninvestigatory capacity, "[t]he scope of [an] encounter must be carefully tailored to satisfy the purpose of the initial detention, and the police must allow the person to proceed once the officer has completed the officer's inquiry, unless, of course, the officer obtains further reason to justify the stop." *Id.* We continued to analyze the initial encounter and brief detention under the standard of reasonable belief, which we analogized to the standard required for a *Terry* stop, but we concluded that the later arrest of the individual was reasonable because, in the course of the encounter, the officers developed probable cause. *Id.* at 1019; *see also Terry v. Ohio*, 392 U.S. 1, 13 (1969) ("Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime.").

Accordingly, we now make explicit that which has long been implicit in our case law and align our circuit with the unanimous consensus in all other circuits. We conclude that only probable cause that a person poses an emergent danger—that is, one calling for prompt action—to herself or others can tip the scales of the Fourth Amendment's reasonableness balancing test in favor of the government when it arrests an individual for a mental-health evaluation because only probable cause constitutes a sufficient "governmental interest" to outweigh a person's "interest in freedom."[5] *See Harris*, 747 F.3d at 1017; *Dunaway v. New York*, 442 U.S. 200, 208 (1979) ("The long-prevailing standards of probable cause embod[y] the best compromise that has been found for accommodating the often opposing interests in safeguarding citizens from rash and unreasonable interferences with privacy and in seeking to give fair leeway for enforcing the law in the community's protection." (internal quotation marks and brackets omitted)). Officers have probable cause to arrest a person for a mental-health evaluation when "the facts and circumstances within . . . the officers' knowledge and of which they had reasonably trustworthy information are sufficient . . . to warrant a man of reasonable caution" to believe that the person poses an emergent danger to himself or others. *Cf. Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *Cantrell*, 666 F.3d at 923 (articulating a similar standard); *Cloaninger*, 555 F.3d at 334 (same).

Our confidence that the Fourth Amendment demands probable cause of dangerousness to effectuate a mental-health arrest in this case is reinforced by the location of this arrest: Graham's home. As the Supreme Court has emphasized, "the right of a man to retreat into his own home and there be free from unreasonable government intrusion stands at the very core of the Fourth Amendment." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks and brackets omitted).

---

[5]Of course, we do not mean *arrest* in the traditional criminal sense. Instead, we agree with our sister circuits that taking a person into custody for an emergency mental-health evaluation "raises concerns that are closely analogous to those implicated by a criminal arrest, and both are equally intrusive." *See Pino*, 75 F.3d at 1468.

-15-

For this reason, the Court has "drawn a firm line at the entrance to the house," and absent a warrant or probable cause and exigent circumstances, police may not seize a person in her home. *Payton v. New York*, 445 U.S. 573, 590 (1980).

2.

Second, we again conclude that the probable-cause standard was not clearly established in our jurisprudence, meaning the officers may still be entitled to qualified immunity even if they seized Graham without probable cause of dangerousness.

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *See District of Columbia v. Wesby*, 583 U.S. ---, 138 S. Ct. 577, 589 (2018). This generally requires a plaintiff to "point to existing circuit precedent that involves sufficiently 'similar facts' to 'squarely govern'" the officers' conduct in the specific circumstances at issue, *see Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020) (brackets omitted), or, in the absence of binding precedent, to present "a robust consensus of cases of persuasive authority" constituting settled law, *see De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017). The plaintiff has the burden to prove that a right was clearly established at the time of the alleged violation. *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018).

Here, Graham cannot point to existing Eighth Circuit precedent that clearly establishes the probable-cause standard because of the ambiguity in our case law highlighted above. Indeed, in her briefing, Graham conceded as much, arguing that *Pirch* clearly established the standard of probable cause but noting that our case law "does create confusion." And during oral argument, Graham's counsel specifically asked this court to "make clear" that probable cause is required in this circuit because "there hasn't been a case that has directly stated what the requirement is for a mental health hold." A right is not clearly established by "controlling authority" merely

-16-

because it may be "suggested by then-existing precedent." *See Wesby*, 138 S. Ct. at 589-90.

Neither is this an instance in which every reasonable officer would have known that his conduct was unlawful due to a robust consensus of authority from other circuits. Though, at the time the officers seized Graham, several other circuits had determined that probable cause was the constitutional standard required to justify a mental-health arrest, our case law was not merely silent on the issue; instead, we had created ambiguity concerning the answer, suggesting that reasonable belief might be sufficient to satisfy the demands of the Fourth Amendment. *See Lane v. Franks*, 573 U.S. 228, 243-46 (2014) (concluding that an official was entitled to qualified immunity because, although decisions from other circuits took one side of an intracircuit debate, the intracircuit panel decisions conflicted). "No matter how carefully a reasonable officer read" our precedent "beforehand, that officer could not know that" the conduct at issue would violate our circuit's "test." *See City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015). This determination is enough to resolve this issue as the officers are entitled to qualified immunity unless the right is established "beyond debate." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

3.

Third, we again conclude that the officers are entitled to qualified immunity because their actions did not violate clearly established law under the more lenient reasonable-belief standard that some of our precedents had suggested was the requisite standard governing warrantless mental-health seizures.

Graham contends that even if the probable-cause standard was not clearly established, no reasonable officer could have believed that it was lawful to seize her because the facts known to the officers after they entered her home did not support even the lower standard of reasonable belief that she presented an emergent danger to herself or others. We disagree. We do not think that only a "plainly incompetent"

officer could conclude he had arguable reasonable belief. *See Mullenix*, 136 S. Ct. at 308; *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019) (explaining that even if officers lack reasonable suspicion for an investigative stop, they are entitled to qualified immunity if they had arguable reasonable suspicion).

Reasonable belief "is a less exacting standard than probable cause," *Quezada*, 448 F.3d at 1007, and, to be reasonable, an officer's belief must be supported by specific, articulable facts, *see United States v. Sanders*, 956 F.3d 534, 539 (8th Cir. 2020). Here, the officers believed that Graham had threatened a family member, and a second family member warned she might fight the officers; Graham called 911 repeatedly over the previous two hours, and the operator reported that her calls were nonsensical; Graham denied calling the police when the officers arrived; and Graham appeared confused as to why the officers were at her home. Although Graham maintained that she was not a threat to herself or others, the officers were not required to believe her, particularly considering her agitated state and the prior reports of threats.

Thus, at the very least, the facts known to the officers at the time were sufficient to support arguable reasonable belief that Graham was experiencing a mental-health crisis and presented an emergent danger to herself or others. *Cf. Ryburn v. Huff*, 565 U.S. 469, 476-77 (2012) ("[I]t is a matter of common sense that a combination of events each of which is mundane when viewed in isolation may paint an alarming picture."). Graham has offered no precedent that squarely governs these facts such that, when considering the officers' "observations as a whole," *Waters*, 921 F.3d at 736, every reasonable officer would have known that he lacked a reasonable belief that Graham was an emergent danger to herself or others, *see Wesby*, 138 S. Ct. at 590 (explaining that, for the law to be clearly established, a reasonable officer must be able to interpret precedent "to establish the particular rule the plaintiff seeks to apply" and to determine that such "legal principle clearly prohibit[s] the officer's conduct in the particular circumstances before him").

*     *     *

The "principle at the heart" of the clearly established requirement is that "state actors are liable only for transgressing bright lines, not for making bad guesses in gray areas." *L.G. ex rel. M.G. v. Columbia Pub. Schs.*, 990 F.3d 1145, 1148 (8th Cir. 2021). For the foregoing reasons, we conclude that, in warrantlessly seizing Graham for a mental-health evaluation, the officers may have made a bad guess in a gray area, but they did not transgress any "bright lines" so as to lose the protection of qualified immunity. Accordingly, we affirm the district court's grant of qualified immunity to the officers regarding Graham's warrantless-seizure claim.

C.

Graham next claims that the district court erred in granting summary judgment to the officers on Graham's claim of retaliatory arrest because, according to Graham, she presented sufficient evidence of retaliatory intent to create a triable issue of fact. We disagree.

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017). To establish a First Amendment retaliatory-arrest claim, a plaintiff must show that (1) she engaged in protected activity, (2) a government official took an adverse action against her that would chill a person of ordinary firmness from continuing in the activity, (3) the adverse action was caused by the exercise of the protected activity, and (4) the government official lacked probable cause or arguable probable cause. *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014).

To survive summary judgment, a plaintiff must show that a reasonable jury could find that a retaliatory motive of the government official was a "but-for cause" of the adverse action, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. ---,

-19-

139 S. Ct. 1715, 1722 (2019) ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury."). "The causal connection is generally a jury question, but it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (internal quotation marks omitted).

For instance, in *Baribeau*, we denied officers qualified immunity on a claim of unreasonable seizure when they arrested and detained protestors without arguable probable cause to believe the protestors either engaged in disorderly conduct or displayed a simulated bomb. 596 F.3d at 481. Even so, we granted the officers summary judgment on the plaintiffs' retaliatory-arrest claim because no "reasonable jury could find that retaliatory animus was a . . . 'but-for' cause" of the arrests where the evidence demonstrated that the officers made the arrest after observing a young girl become frightened by the plaintiffs' appearance, and because the evidence demonstrated that the decision to arrest the plaintiffs was "based on an actual but overly exaggerated belief that the plaintiffs violated the WMD statute." *Id.*

Given the information available to the officers in this case, we likewise determine that no reasonable jury could conclude that retaliatory animus was a but-for cause of Graham's arrest. As in *Baribeau*, there is no evidence that the officers' actions were based on anything other than perhaps "an actual but overly exaggerated belief" that Graham was experiencing a mental-health emergency and presented a threat either to herself or to others. And though the temporal proximity of Graham's protected activity and her subsequent arrest is relevant, it is not enough on its own to create a triable issue of fact regarding cause where no other record evidence supports finding a retaliatory motive and there is evidence that the officers acted in good faith. *See Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006) ("Temporal proximity is relevant but not dispositive."); *see also Williams v. City of Carl Junction*, 480 F.3d 871, 877-78 (8th Cir. 2007) (holding that the plaintiff had not demonstrated retaliatory animus sufficient to support a retaliatory-prosecution claim under the First Amendment where he "presented no evidence"—other than the

traffic ticket itself—"that the officer who issued [the] citation harbored any retaliatory animus against him").

Thus, the district court properly granted the officers summary judgment on Graham's retaliatory-arrest claim.

D.

Graham next contends that the City's policy concerning seizures for an emergency mental-health evaluation caused the officers to violate her Fourth Amendment rights because the policy was facially unconstitutional. In the alternative, Graham argues that the City should be liable because it was deliberatively indifferent to her constitutional rights and failed to train the officers properly. We conclude that the district court did not err in granting the City summary judgment.

"A municipality may be liable under § 1983 where 'action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991-92 (8th Cir. 2015) (quoting *Monell*, 436 U.S. at 691). When a city's policy is facially unconstitutional, we have recognized that "resolving [the] issues of fault and causation is straightforward." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir. 2007) (en banc). In that instance, "[t]o establish a constitutional violation, no evidence is needed other than a statement of the municipal policy and its exercise." *Id.*

The relevant portion of the MCCTA provides that an officer may seize a person for an emergency mental-health evaluation and transport that person to "a licensed physician or treatment facility if the officer has *reason to believe* . . . that the person is mentally ill . . . and in danger of injuring self or others if not immediately detained." Minn. Stat. § 253B.05, subd. 2(a) (emphasis added). In compliance with the statute, the City's policy allows an officer to take a person with mental illness into custody "if there is a *reason to believe* the person poses a threat

-21-

to himself or others."  The policy further directs that "[t]he threat does not have to be imminent."

The district court initially denied the City summary judgment, determining that the phrase "reason to believe" was inconsistent with the Fourth Amendment's probable-cause requirement for a mental-health seizure.  After the City filed a motion for reconsideration, the district court determined that it had "made a manifest error of law" by failing to construe the phrase "reason to believe" to require probable cause.

We agree that the policy is not facially unconstitutional.  First, "reason to believe" is commonly used to mean probable cause.  For instance, in *United States v. Quintana*, we analyzed the meaning of the phrase "reason to believe" in a federal immigration statute relating to arrests of undocumented aliens and concluded that the phrase means "constitutionally required probable cause."  623 F.3d 1237, 1239 (8th Cir. 2010); *see also United States v. Stead*, 422 F.2d 183, 184 n.1 (8th Cir. 1970) (per curiam) ("Probable cause exists since a prudent man would have had reason to believe that this defendant had committed a felony.").  Other circuits have come to similar conclusions when interpreting statutes governing mental-health seizures.  In *Cantrell*, for example, the Fifth Circuit interpreted the Texas Health and Safety Code's use of "reason to believe" to require probable cause.  666 F.3d at 923.

Second, the policy's language stating that the threat presented "does not have to be imminent" does not make the policy facially unconstitutional.  To be sure, a mental-health seizure must be justified by probable cause that the person subject to the arrest presents an emergent threat of harm to herself or others, but government officials need not wait to intervene until an individual is a split second away from harming herself or others.  *See Meyers v. Comm'r of Soc. Sec. Admin.*, 801 F. App'x 90, 95 (4th Cir. 2020) (per curiam) ("'Imminent' means 'threatening to occur immediately; dangerously impending' or '[a]bout to take place.'" (quoting *Black's Law Dictionary* (11th ed. 2019)); *United States v. Hardeman*, 449 F. App'x 408, 410 (5th Cir. 2011) (per curiam) (defining imminent as "impending; on the point of

-22-

happening"). The Fourth Amendment does not demand that police wait until a suicidal citizen has raised a gun to her temple before officers may intervene. *See Caniglia*, 141 S. Ct. at 1604 (Kavanaugh, J., concurring) (explaining that "the Court's exigency precedents" do not require that the harm be "mere moments away"). Instead, it requires only that a prudent person would have reason to believe that the individual subject to the seizure presents a threat to herself or others such that an order of a court or other authority cannot be obtained in time to prevent the anticipated harm or injury. *See Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (explaining that police may rely on the exigent-circumstances or emergency-aid exceptions when "there is compelling need for official action and no time to secure a warrant"); *Caniglia*, 141 S. Ct. at 1602 (Alito, J., concurring) (noting that circumstances are "exigent" when "there is not enough time to get a warrant"). As a result, the policy is not facially unconstitutional because it does "not affirmatively sanction" an unconstitutional action. *See Szabla*, 486 F.3d at 392.

Where an official policy is lawful on its face, a plaintiff nevertheless may establish liability by showing that a municipality caused the constitutional violation by providing "inadequate training" for its employees. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010). To establish such liability, a plaintiff must show that (1) the municipality's "training practices [were] inadequate," (2) the municipality was "deliberately indifferent" to the plaintiff's rights when adopting the training practices such that the "failure to train reflects a deliberate or conscious choice," and (3) the plaintiff's injury was "actually caused" by the "alleged deficiency" in the training practices. *Id.*

Graham has not met this standard for two reasons. First, she advances no evidence concerning other mental-health seizures, so she has not shown a history of the City's officers committing unreasonable seizures such that the need for additional training was plain. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407-08 (1997). The Supreme Court has held that a "pattern of similar constitutional violations" is "ordinarily necessary" to establish municipal liability, *Connick v. Thompson*, 563 U.S. 51, 62 (2011), unless "the need for more

or different training is so obvious and the inadequacy [is] so likely to result in the violation of constitutional rights" that the municipality can be said to have been "deliberatively indifferent to the need," *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Here, there is no evidence of past violations, and what happened to Graham is not "so obviously" the consequence of a systemic lack of training, as opposed to the decisions of individual officers, that the need for different or additional training was plain. *See Dick v. Watonwan Cnty.*, 738 F.2d 939, 942 (8th Cir. 1984) (noting that an "isolated incident" is "not enough to establish a policy or custom").

Second, "the lack of clarity in the law" concerning the appropriate standard of cause needed to justify a mental-health hold "precludes a finding that the municipality had an unconstitutional policy at all, because its policymakers cannot properly be said to have exhibited a policy of *deliberate* indifference to constitutional rights that were not clearly established." *Szabla*, 486 F.3d at 394; *see also Hollingsworth*, 800 F.3d at 992 ("While a single constitutional violation arising out of a lack of safeguards or training may be sufficient to establish deliberate indifference where the need for such safeguards or training is obvious, a municipality cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." (internal quotation marks omitted)). In other words, because the right at issue was not clearly established, Graham cannot meet the "demand that deliberate indifference in fact be deliberate." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017) (discussing and adopting the Eighth Circuit's approach).

Accordingly, the district court correctly entered summary judgment in favor of the City on Graham's *Monell* claims.

## III.

We next consider the district court's grant of summary judgment to the officers on Graham's state-law claims. Graham contends that the district court improperly granted summary judgment to the officers on her claims of false

imprisonment, battery, assault, and negligence because it erroneously concluded that they were entitled to statutory and official immunity under Minnesota law. We review *de novo* the application of state statutory and official immunity. *See Boudoin*, 962 F.3d at 1044; *Johnson v. City of Minneapolis*, 901 F.3d 963, 972 (8th Cir. 2018). We conclude that the district court did not err.

The MCCTA includes a statute-specific immunity section that provides:

> All persons acting in good faith, upon either actual knowledge or information thought by them to be reliable, who act pursuant to any provision of this chapter or who procedurally or physically assist in the commitment of any individual, pursuant to this chapter, are not subject to any civil or criminal liability under this chapter.

Minn. Stat. § 253B.23, subd. 4. Thus, all persons who in good faith participate in the civil-commitment process, including by seizing someone for an emergency mental-health evaluation, are immune from any civil or criminal liability, regardless of whether the detained person is actually committed. *Losen v. Allina Health Sys.*, 767 N.W.2d 703, 709 (Minn. Ct. App. 2009) (holding that the MCCTA "encompasses the good-faith decision whether to place an emergency hold on a proposed patient, even if the result of that decision is that no hold is placed"). The grant of immunity provides complete immunity from suit. *Dokman v. Cnty. of Hennepin*, 637 N.W.2d 286, 297 (Minn. Ct. App. 2001).

Just as Graham has not demonstrated a triable issue of fact as to whether the officers had the requisite retaliatory animus to support her First Amendment retaliatory-arrest claim, she has not shown a triable issue of fact regarding the good-faith belief of the officers when they seized her for a mental-health evaluation. *See supra* Section II.C. She simply advances no evidence that the officers acted in bad faith. They are thus entitled to statutory immunity.

For similar reasons, the officers also are entitled to official immunity. Under Minnesota law, a public official is entitled to official immunity when his conduct

requires the exercise of discretion or judgment and there is no evidence that he acted maliciously or in bad faith. *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990); *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 679 (Minn. 1988). "In determining whether an official has committed a malicious wrong, we consider whether the official has intentionally committed an act that he or she had reason to believe is prohibited." *Hassan v. City of Minneapolis*, 489 F.3d 914, 920 (8th Cir. 2007). Here, the officers could not have acted in a manner that they believed to be unlawful when seizing Graham because, as discussed above, the law was not clearly established. *See id.*

## IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment.

_____